|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
|  | ) | Criminal No. 08-10215-PBS |
| v. | ) | |
|  | ) | |
| KEVIN CARVAHLO, | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

June 18, 2015

Saris, U.S.D.J.

Kevin Carvahlo is a federal prisoner serving a sentence of 126 months of imprisonment after being convicted by a jury of conspiracy to possess with intent to distribute cocaine base (Count 1) and possession with intent to distribute cocaine base (Count 2). Carvahlo now moves to vacate his convictions and sentence under 28 U.S.C. § 2255, arguing that: (1) the Court violated his Sixth Amendment rights by imposing a mandatory minimum sentence based on judicial fact-finding; and (2) the government failed to disclose the scandal involving chemist Annie Dookhan and the Hinton Drug Lab in Jamaica Plain.[1] The government opposes the motion and has requested summary dismissal. (Docket

---

[1] Carvahlo also moved to adopt the argument of his codefendant Charles Doutre on this claim that the government failed to disclose evidence regarding the Hinton Drug Lab scandal. (Docket No. 228). That motion is **ALLOWED**.

1

No. 234). For the following reasons, Carvahlo's Motion to Vacate under 28 U.S.C. § 2255 (Docket No. 221) is **DENIED**. The government's request for summary dismissal (Docket No. 234) is **ALLOWED**.

**DISCUSSION**

**A. Judicial Fact-Finding and the Sixth Amendment**

Carvahlo first raises a Sixth Amendment claim, arguing that the Court improperly imposed a mandatory minimum sentence after finding that he was personally responsible for more than 50 grams of cocaine base as part of the conspiracy charged in Count 1. Instead, Carvahlo argues that the jury should have been asked to make the determination beyond a reasonable doubt. In support of these arguments, Carvahlo highlights the Supreme Court's recent decision in Alleyne v. United States, which held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." ___ U.S. ___, 133. S.Ct. 2151, 2155 (2013). In doing so, the Supreme Court overruled its own precedent that existed at the time of Carvahlo's sentencing. Id. at 2151 (overruling Harris v. United States, 356 U.S. 545 (2002)).

Carvahlo's argument fails because Alleyne's sea change in the law is not retroactively applicable to his case. Alleyne was decided in June 2013, more than a year after Carvahlo's conviction became final. Thus, Carvahlo can only benefit from

2

Alleyne's newly announced rule of criminal procedure if it is retroactively applicable on collateral review. See Sepulveda v. United States, 330 F.3d 55, 59 (1st Cir. 2003) (explaining that the Supreme Court's decision in Teague v. Lane, 489 U.S. 288 (1989) "constitutes a general bar to the retroactive application of newly announced rules of criminal procedure"). But the First Circuit has squarely held that it is not. See Butterworth v. United States, 775 F.3d 459, 468 (1st Cir. 2015) ("We therefore conclude that the rule announced in Alleyne is not retroactively applicable to sentences on collateral review on an initial habeas petition."). As a result, Carvahlo cannot benefit from Alleyne to the extent that it overruled First Circuit precedent at the time of his sentencing and direct appeal.

**B. Government's Failure to Disclose the Hinton Drug Lab Scandal**

Carvahlo next argues that the government failed to disclose exculpatory evidence to him prior to trial, namely the scandal involving Annie Dookhan and the Hinton Drug Lab. In August 2012, the public learned that Dookhan had falsely certified drug test results and tampered with samples at the Hinton Drug Lab. Had the government disclosed these misdeeds, Carvahlo argues that his trial would have turned out differently. The Court disagrees.

The framework for analyzing Carvahlo's claim was first established in Brady v. Maryland, 383 U.S. 83 (1963). There, the Supreme Court held that the government's suppression of evidence

3

favorable to the accused violates due process where the evidence is material to guilt or punishment. Id. at 87. "To establish a Brady violation, a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e. the suppressed evidence was material to guilt or punishment)." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005). see also Kyles v. Whitley, 514 U.S. 419, 435 (1995) (evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). For example, a new trial may be required if the government suppressed impeachment evidence "where the evidence is highly impeaching or when the witness' testimony is uncorroborated and essential to the conviction." United States v. Martinez-Medina, 279 F.3d 105, 126 (1st Cir. 2002). On the flip side, suppressed evidence may be immaterial under Brady "if the evidence is cumulative or impeaches on a collateral issue." Conley, 415 F.3d at 189.

With these principles in mind, Carvahlo's Brady claim falls short because he cannot establish materiality. In other words, he has not shown a reasonable probability that his trial would have come out differently if the government had disclosed the Hinton Lab scandal to him. This conclusion is based on several factual findings:

4

To begin with, there was overwhelming evidence at trial that Carvahlo and his codefendant Charles Doutre possessed authentic cocaine base on the night of their arrest, not some counterfeit substance. That night, police officers followed a car from an apartment complex at 157 Second Street in Framingham, Massachusetts to a nearby liquor store. After parking, Carvahlo exited the driver's side of the car and walked into the store. Meanwhile, one of the officers approached Doutre, who was sitting in the front passenger seat. The officer saw Doutre attempt to hide something in his waist area, piquing the officer's suspicion that Doutre was trying to conceal contraband. As a result, the officer asked him to step out of the car, which revealed a ziplock bag where Doutre had been sitting. Multiple officers on the scene identified the substance in the bag as a chunk of cocaine base (otherwise known as crack cocaine).

After arresting Doutre and Carvahlo, both of them were later strip searched. These strip searches revealed a second bag of crack cocaine hidden in Carvahlo's buttocks and a third bag of crack cocaine hidden in Doutre's clothing. Combined, these two bags contained approximately 40 smaller baggies of crack cocaine. Police testified that these small baggies were packaged in a way that was commonly sold for $40 or $50 on the street. During booking, the police also recovered $751 and a cell phone from Doutre, and $122 in cash and a cell phone from Carvahlo,

5

suggesting that they intended to sell the packages of crack cocaine on the street.

On top of all this, the police returned later that night to the apartment complex at 157 Second Street, where they encountered Sharon Fogerty and searched her apartment. Fogerty testified at trial that she and her boyfriend allowed Doutre and Carvahlo to package and sell crack cocaine out of their apartment approximately four times a week. In exchange, Doutre provided crack cocaine to Fogerty and her boyfriend, who were both crack addicts and daily users. On the night of Doutre's arrest, Fogerty stated that Doutre and Carvahlo came by to package the crack cocaine in her apartment, chopping the drugs up on a plate with a razor and placing them into small baggies. They then left and did not return. The police also searched Fogerty's apartment and recovered a half-used box of sandwich baggies much like the ones found on Doutre and Carvahlo, pipes and filters used for smoking crack cocaine, as well as a razor blade with caked-on residue that was identified as crack cocaine.[2]

In sum, the police recovered three bags of suspected crack cocaine from Doutre and Carvahlo. The substance in each bag was identified as crack cocaine by police officers. Each of the three bags was also individually field tested by the police, and all

---

[2]The Court excluded evidence of the results of the police's field test on the residue on the razor blade.

three tests returned positive results for cocaine. Additionally, two of the bags contained smaller packages that were ready to be sold for $40 or $50 on the street. Police also recovered from Doutre and Carvahlo large sums of cash and cell phones. Finally, the government also presented testimony from Fogarty, who confirmed that she and her boyfriend were addicts who smoked the crack cocaine provided by Doutre on a daily basis. All of this is evidence that Doutre and Carvahlo possessed real drugs, not counterfeit.

The impeachment value of the Dookhan scandal is also far less powerful than Carvahlo suggests. Dookhan was neither the primary or even the secondary chemist assigned to analyze the drugs in Carvahlo's case. Rather, the suspected crack cocaine in Carvahlo's case was analyzed by Michael Lawler and Daniel Renczkowski, neither of whom has been implicated in the scandal at the Hinton Drug Lab. Further, the Massachusetts Inspector General (OIG) has released its report following an investigation of the lab. This report, released on March 4, 2014, states in relevant part:

> Dookhan was the sole bad actor at the Drug Lab. Though many of the chemists worked alongside Dookhan for years, the OIG found no evidence that any other chemist at the Drug Lab committed any malfeasance with respect to testing evidence or knowingly aided Dookhan in committing her malfeasance. The OIG found no evidence that Dookhan tampered with any drug samples assigned to another chemist even when she played a role in confirming another chemist's test results.
> ...
> [T]he OIG found no evidence to support treating cases in which

7

> Dookhan had no known interaction with the drug sample in question with any increased level of suspicion related to Dookhan.

(Docket No. 229-2:9, 11). Given the lack of evidence that Dookhan had anything to do with this case, Doutre cannot establish the materiality of the scandal.

Carvahlo responds that there have also been a number of systematic problems at the Hinton Drug Lab, including (1) lax security surrounding the evidence safe and lab computers; (2) outdated standard operating procedures; and (3) lack of documentation regarding discrepancies between the results reached by primary and confirmatory chemists. He also observes that Dookhan had access to the main evidence safe at the Hinton Drug Lab, which meant that she could tamper with any sample, even those not specifically assigned to her. This argument is not without force. It is easy to imagine how Carvahlo could have used the Dookhan scandal and the systematic problems at the Hinton Drug Lab to score points while cross-examining the government's chemist at trial. But there is no evidence to suggest that these problems affected the results in Carvahlo's case. See Wilkins v. United States, 754 F.3d 24, 29 (1st Cir. 2014) (rejecting petitioner's argument that "Dookhan's wrongdoing was so malignant . . . that it infected everything that was at the Hinton Lab"). Further, this evidence of generalized failings at the Hinton Drug Lab must be placed into the context of the entire record, which

overwhelmingly shows that Carvahlo and Doutre were carrying crack cocaine on the night of his arrest. See Conley, 415 F.3d at 189 (explaining that the probative value of impeachment evidence is limited when "additional evidence strongly corroborates the witness's testimony" that might have been impeached). As a result, the Court concludes that Carvahlo has not satisfied the materiality prong of the Brady analysis.

## ORDER

Carvahlo's Motion to Vacate under 28 U.S.C. § 2255 (Docket No. 221) is **DENIED**. The government's request for summary dismissal (Docket No. 234) is **ALLOWED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge